# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | |
| ) | |
| APPROXIMATELY $1,058,153.78 ) | Case No. |
| WORTH OF EQUITIES, ) | |
| ANNUITIES, AND OTHER ) | |
| INVESTMENT VEHICLES ) | |
| CONTAINED IN BB&T ) | |
| ACCOUNT NUMBER ****-5508 ) | |
| HELD IN THE NAME OF MARK ) | |
| MURPHY WITH DESIGNATED ) | |
| BENEFICIARY, JENNIFER ) | |
| MURPHY; and ) | |
| ) | |
| APPROXIMATELY $380,723.35 ) | |
| WORTH OF EQUITIES, ) | |
| ANNUITIES, AND OTHER ) | |
| INVESTMENT VEHICLES ) | |
| CONTAINED IN BB&T ) | |
| ACCOUNT NUMBER ****-2106 ) | |
| HELD IN THE NAME OF ) | |
| JENNIFER MURPHY WITH ) | |
| DESIGNATED BENEFICIARY, ) | |
| MARK MURPHY ) | |
| ) | |
| Defendants. ) | |

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

Comes now the United States of America, by and through its counsel, Jay E.

Town, United States Attorney for the Northern District of Alabama, and Nicole

1

Grosnoff, Assistant United States Attorney for this district, and respectfully shows the Court the following in support of its Complaint for Forfeiture:

1.      This is a civil action *in rem*, pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 981(a)(1)(C) for the forfeiture of:

> a.      Approximately $1,058,153.78 worth of equities, annuities, and other investment vehicles contained in BB&T Account Number ****-5508 held in the name of Mark Murphy with designated beneficiary, Jennifer Murphy; and
>
> b.      Approximately $380,723.35 worth of equities, annuities, and other investment vehicles contained in BB&T Account Number ****-2106 held in the name of Jennifer Murphy with designated beneficiary, Mark Murphy

(collectively the "Defendant Accounts").

2.      The Court has jurisdiction over this subject matter pursuant to Title 28, United States Code, Sections 1345 and 1355.

3.      This Court has *in rem* jurisdiction over the Defendant Accounts pursuant to Title 28, United States Code, Section 1355.

4.      This Court has venue over this action pursuant to Title 28, United States Code, Sections 1355 and 1395.

## I.   KEY PERSONS AND ENTITIES

5.      Mark A. Murphy, M.D. ("Dr. Murphy") is a pain management doctor. From 2004 until February 2017, he maintained active DEA registrations in the State of Alabama.   One of these registrations expired in 2015, and the other was

voluntarily surrendered in February 2017. From March 2016 until at least July 27, 2018, he has maintained an active DEA registration in the State of Tennessee.

6. Dr. Murphy has operated out of multiple clinics, located in Alabama and Tennessee:

    a. From 2004 to December 2016, Dr. Murphy owned and operated North Alabama Pain Services located in Decatur, Alabama ("NAPS - Decatur").

    b. From 2013 to December 2016, Dr. Murphy owned and operated North Alabama Pain Services located in Madison, Alabama ("NAPS - Madison"). These practices were approximately 30 to 35 miles apart.

    c. Since at least November 2015, he practiced part-time, and starting January 2017 fulltime, at Montclair Health and Wellness, LLC, DBA Specialty Associates ("Specialty Associates") and North Alabama Pain Services, LLC ("NAPS-Lewisburg"), located in Lewisburg, Tennessee 37091. Dr. Murphy works with two other medical practitioners (an advanced practiced nurse and a family nurse practitioner).

7. In December 2016, following an investigation into his prescribing practices by the Alabama Board of Medical Examiners ("ALBME"), Dr. Murphy closed NAPS-Decatur and NAPS-Madison. In January 2017, he began practicing full-time at Specialty Associates/NAPS-Lewisburg, in Lewisburg, Tennessee.

8. Jennifer Murphy ("J. Murphy") is Dr. Murphy's wife, and she was also the office manager and involved in the operations of the clinics described above.

9. The Crystal Murphy Enrichment Organization ("CMEO") is registered with the IRS as a 501(c)(3) charitable organization, and thus is a tax-exempt non-

profit organization. CMEO is operated by Dr. Murphy and J. Murphy, and it is named after their deceased daughter. According to CMEO's website, its mission is "to give children and adults the chance to visit national parks and historical sites." The website further states that "Since our 501c3 creation in 2009, we have awarded students with college scholarships and have provided aid to struggling limited income families in need of support, along with trying to show people the beauty of God and his Words!"

10. There is reason to believe that Dr. Murphy and J. Murphy have been engaging in the unlawful dispensation of controlled substances, healthcare fraud, violations of the Anti-Kickback Statute, and money laundering since at least 2012.

## II. UNLAWFUL DISPENSATION OF CONTROLLED SUBSTANCES

11. Evidence indicates that Dr. Murphy, aided and abetted by J. Murphy, has unlawfully distributed controlled substances since at least 2012.

### A. Statutes and Regulations

12. Title 21, United States Code, Sections 841 and 846 criminalize the knowing or intentional distribution or dispensation of a controlled substance except as authorized by law, or an attempt or conspiracy to commit any such conduct.

13. Under Title 21, United States Code, Sections 822(a)(1) and (a)(2), and Title 21, Code of Federal Regulations, Section 1301.11, and other regulations, a person who distributes or dispenses any controlled substance, or who proposes to

dispense any controlled substance, must obtain a registration from the DEA every three years.

14.     Under Title 21, Code of Federal Regulations, Section 1306.03, a prescription for a controlled substance may only be issued by a practitioner who is both authorized to prescribe in the jurisdiction in which he or she is licensed to practice his or her profession and registered with the Drug Enforcement Administration (DEA) (unless otherwise exempt from registration).

15.     Under Title 21, Code of Federal Regulations, Sections 1306.03(a)(1) and (a)(2), and 1306.04(a), a prescription for a controlled substance is only valid if it has been issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice.

16.     Under Title 21, Code of Federal Regulations, Section 1306.05, prescriptions for Schedule II, III, and IV controlled substances are required to be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address, and registration number of the practitioner.

**B. State Controlled Substance Monitoring Programs**

17.     In Alabama, anyone who dispenses a Schedule II, III, IV, or V controlled substances is required by law to report the dispensing of these drugs to the Prescription Drug Monitoring Program ("PDMP").  Alabama Code Section 20-

2-213(a), (b)(3).  The daily report submitted by the dispenser includes: (a) name or other identifying designation of the prescribing practitioner, (b) date prescription was filled or medications dispensed, (c) name of person and full address for whom the prescription was written or to whom the medications were dispensed, and (d) quantity of controlled substance dispensed.

18.     The Controlled Substance Monitoring Database ("CSMD") for Tennessee is similar to the Alabama PDMP.

## C. Unlawful Distribution of Controlled Substances

19.     Evidence indicates that Dr. Murphy prescribed controlled substances without a legitimate medical purpose acting outside the usual course of professional practice.

20.     Starting at least in 2013, Dr. Murphy has been the subject of various inquiries and investigations into his prescribing of controlled substances:

    a. In October 2013, a physician with the Alabama Medicaid Agency ("AMA") completed a review of 21 of Dr. Murphy's patient files from 2012 and 2013.  Among other things, that review expressed concerns about Dr. Murphy's "high rate of prescribing controlled substances," and that patients' medical records appeared to be cloned.  In 2015, the physician conducted a follow-up review of 36 patient charts, and expressed similar concerns.

    b. In September 2015, Blue Cross Blue Shield of Alabama ("BCBSAL") provided Dr. Murphy with the results of an audit into his provision of medical services.  To conduct the review, on October 21, 2014, BCBSAL obtained 39 of Dr. Murphy's patient files and consulted with a "board certified peer."  The review

identified various "areas of concern" including "[h]igh volume and frequency of Schedule II Controlled Substances Class II."

    c. In August 2016, following an investigation that included interviews with Dr. Murphy and a review of 15 of his patient files, the Alabama Board of Medical Examiners ("ALBME") filed an Administrative Complaint, charging that Dr. Murphy was, among other things, prescribing controlled substances without a legitimate medical purpose. As a result of the ALBME investigation, in December 2016, Dr. Murphy closed the NAPS-Decatur and NAPS-Madison clinics, and let his Alabama medical license and controlled substance license expire. He began practicing primarily out of NAPS-Lewisburg, in Tennessee.

    d. In February 2017, after meeting with DEA Investigators, Dr. Murphy voluntarily surrendered his Alabama DEA number. In surrendering that registration, Dr. Murphy acknowledged that the surrender was "[i]n view of my alleged failure to comply with the Federal requirements pertaining to controlled substances, and as an indication of my good faith in desiring to remedy any incorrect or unlawful practices on my part."

21. Clinics that illegally distribute or dispense controlled substances under the guise of operating seemingly legitimate medical clinics are colloquially referred to as "pill mills." Evidence indicates that Dr. Murphy's practice, with J. Murphy operating as office manager and involved in day-to-day operations, has many of the red flags associated with pill mills. A discussion of some of those red flags follows.

22. One red flag is when a physician consistently prescribes high levels of controlled substances to patients. Prescribing data indicates that:

    a. In 2015, Dr. Murphy was one of the top prescribers in the nation for oxycodone, morphine sulfate, morphine sulfate extended release, OxyContin, and methadone for Medicare Part D.

  b. In 2014 and 2015, Dr. Murphy was the fifth highest prescriber of controlled substances in Alabama (not limited to Medicare Part D).

23. Another red flag is when a high volume of patients visit the clinic. From at least 2012 to present, Dr. Murphy was the only physician practicing at NAPS. In October 2015, Dr. Murphy informed the ALBME that NAPS-Decatur and NAPS-Madison saw an average of 2,000 patients a month. He further indicated that approximately 100 to 120 patients were seen every day at the two clinics, with approximately 30 to 40 of those patients seen at the clinic where he was not present. During that interview, Dr. Murphy failed to inform the ALBME that he also practiced with NAPS-Lewisburg, which would increase the number of patients that went through the clinic each week and/or month.

24. Another red flag is when the physician causes prescriptions to be issued during times when he or she is not at the clinic by instructing staff to issue pre-signed and/or pre-dated prescriptions. Evidence, including Dr. Murphy's statements to the ALBME, indicates that Dr. Murphy signed prescriptions for controlled substances approximately a week in advance of patients' visits, and he instructed nurses (who were not licensed to prescribe or continue controlled substances) to see and distribute these prescriptions to patients. This occurred even when Dr. Murphy was present at the clinic. Evidence further indicates that Dr. Murphy routinely delegated responsibility for patient care to nurses and other staff, with some patients going

several months without being seen by Dr. Murphy, but continuing to receive prescriptions for controlled substances signed by Dr. Murphy.

25.     Another red flag is when a physician conducts sham diagnostic and alternative treatment programs.  Evidence indicates Dr. Murphy required patients to obtain nerve testing in exchange for payment from the testing company and without regard to patients' medical needs.  Evidence further indicates that Dr. Murphy delegated responsibility for prescribing compound drugs and durable medical equipment (*e.g.*, braces) to individuals who were both unlicensed and unqualified to make medical decisions, and who were also paid by sales representatives for the prescriptions they issued.

26.     Another red flag is when a patient's urine drug test indicates the patient is either taking illegal drugs and/or not taking prescribed drugs (which would indicate the patient is diverting/selling those prescribed drugs), but the physician nonetheless continues to prescribe the controlled substances.  In its August 2016 Administrative Complaint, the ALBME found that Dr. Murphy repeatedly prescribed controlled substances to patients with documented substance abuse disorders, noncompliance, and ongoing substance abuse.

27.     Another red flag is when the physician prescribes inappropriate combinations/"cocktails" of drugs to patients (*i.e.*, ones that have an adverse effect when combined).  For instance, the ALBME's investigation found that as of

February 2013, Dr. Murphy issued to Patient G.A. multiple regular prescriptions for hydrocodone, alprazolam, and morphine extended release. The ALBME noted that this combination of opiate and benzodiazepine was "a significant cause of drug [] interaction and accidental overdose," the risk of which was increased by G.A.'s documented medical history. The ALBME further noted that G.A. continued to receive his regular prescriptions even after his April 2013 UDS showed the presence of an unprescribed drug (a benzodiazepine) and a January 2014 drug screen did not show a prescribed drug (morphine), even though a prescription had been filled 28 days earlier. In April 2014, Patient G.A. overdosed on medication, but survived. Shortly after learning about the overdose, Dr. Murphy discharged G.A. from his care for "violat[ing] the opiate agreement."

28.     Another pill mill red flag is a cash-heavy clinic. In a 2015 statement, Dr. Murphy informed the ALBME that he did not accept Medicaid for office care, and required patients without accepted insurance or no insurance to pay $450 for the first two initial visits and $100 thereafter for routine office visits, and $25 for urine drug screens. (He reported charging about $25/$50 less about two years prior). Medicaid patients are low-income individuals for whom payment of $450 cash for the first two visits with Dr. Murphy, as opposed to visits with a physician who accepts Medicaid, would likely constitute a significant hardship. In light of this hardship, there is reason to question why these patients or self-pay patients would

choose to go to Dr. Murphy (instead of a doctor for whom an office visit would be covered by insurance or who charged less).

29.     Another pill mill red flag is when patients travel long distances (including from out-of-state) to see the physician.  Evidence indicates that patients routinely traveled from Alabama to see Dr. Murphy in Tennessee after he closed his Alabama clinics.[1]

## III.    HEALTHCARE FRAUD AND KICKBACKS

30.     There is reason to believe that Dr. Murphy and J. Murphy have committed health care fraud and solicited and received kickbacks/payments in exchange for ordering services, including services paid for by federal health care programs.

### A. Health Insurance Programs

31.     The Medicare Program ("Medicare") is a federally funded health insurance program that is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the United States Department of Health and Human Services ("HHS").  Medicare is designed to provide free and below-cost health insurance coverage for certain individuals, primarily those over 65 years of age, the disabled, and the blind.  These individuals are known as Medicare "beneficiaries."

---

[1] The distance from Athens (which appears to be the largest Alabama town closest to the Tennessee Border) to Lewisburg, is approximately 50 miles.  The distance from Decatur or Madison, Alabama (where Dr. Murphy's prior clinics were located) to Lewisburg is approximately 66 miles.

Medicare programs covering different types of benefits are separated into different program "parts." Part B covers office visits and services, and Part D covers prescription drugs.

32. The Medicaid Program ("Medicaid") is a joint federal and state health insurance program that is administered by individual states in coordination with CMS. The program provides free and below-cost insurance to low-income individuals and families. The Alabama Medicaid program is administered by the Alabama Medicaid Agency. Approximately 70% of the funding for the Alabama Medicaid program comes from the federal government and the remainder comes from the state. The Tennessee Medicaid Program, TennCare, is a managed care system in which TennCare contracts with managed care organizations to provide health insurance for TennCare beneficiaries. Approximately 65% of the funding for the TennCare program comes from the federal government and the remainder comes from the state.

33. Blue Cross Blue Shield of Alabama ("BCBSAL") is a private insurance company providing medical insurance for various persons residing in Alabama.

34. Among the health care benefits, items, and services that are covered by insurance programs such as Medicare, Alabama Medicaid, TennCare, and BCBSAL, are office visits and services; procedures such as nerve testing sometimes performed

by third parties; urine drug testing; and durable medical equipment and prescription drugs.

35. Physicians, such as Dr. Murphy, who participate in these insurance programs, either by rendering services or ordering services, must adhere to all relevant regulations of the insurance programs, or those of their third-party intermediaries through which claim payments may be received, adjudicated and paid. Among these regulations are that providers may only submit or order claims for medical services which are reasonable and medically necessary.

36. Providers such as Dr. Murphy bill Medicare and other insurance plans for the services they render using a HCFA-1500, or an equivalent form. Submission of this form constitutes a certification to Medicare and other insurance plans that the information contained in the claim is truthful and correct and in compliance with all federal law and regulations governing these plans. Consequently, misrepresentations or omissions of material facts in a claim would constitute evidence of one or more federal criminal offenses, as outlined below.

37. It is the responsibility of the medical provider submitting a HCFA 1500 to select the Current Procedural Terminology ("CPT") or other code that accurately describes the service being provided and to ensure that they submit claims for medical services that are reasonable and medically necessary.

## B. Relevant Statutes and Regulations

38.     Title 18, United States Code, Section 1347 criminalizes the knowing and willful execution of a scheme to defraud any health care benefit program, or an attempt to do so, *i.e.*, health care fraud.  Title 18, United States Code, Section 1349 criminalizes conspiring to commit health care fraud.  Medicare, Medicaid Alabama, TennCare, and BCBSAL are "health care benefit programs," as defined by Title 18, United States Code, Section 24(b), and used in Title 18, United States Code, Sections 1347 and 1349.

39.     Title 42, United States Code, Section 1320a-7b(b), sometimes referred to as the Anti-Kickback Statute, prohibits the solicitation or receipt or payment of remuneration (including kickbacks or bribes) in exchange for referring services paid for by Federal health care programs.  Medicare, Medicaid Alabama, and TennCare are "Federal health care programs," as defined by Title 42, United States Code, Section1320a-7b(f), and as that term is used in Title 42, United States Code, Section 1320a-7b(b).

## C. Health Care Fraud and Violations of the Anti-Kickback Statute

40.     Evidence indicates that Dr. Murphy billed for and referred medically unnecessary services.  Evidence further indicates that Dr. Murphy and related individuals and entities solicited and received kickbacks in exchange for Dr. Murphy's referral of services for: **(a)** nerve tests; **(b)** urine drug testing; and **(c)**

prescriptions for durable medical equipment (*e.g.*, braces), compounded and other drugs.

41. The related individuals and entities include:

   a. J. Murphy, who served as the office manager of the Alabama NAPS' locations.

   b. Willie F. Murphy ("W. Murphy"), who is Dr. Murphy's brother.

   c. Mark Murphy, Jr. ("M. Murphy, Jr."), who is Dr. Murphy's son.

   d. CMEO, the non-profit previously described, acting through Dr. Murphy and J. Murphy.

   e. Urine collection technicians, who were employed and/or contracted with independent urine drug testing companies, but who worked out of NAPS ("Contract Urine Collection Technicians.").

   ### i. *Nerve Testing*

42. Nerve Conduction Velocity Tests and Evoked Potential Reflex Tests (hereafter "nerve tests") are electro-diagnostic tests designed to evaluate patients who may have nerve damage.

43. Evidence indicates that from approximately March 2012 to September 2017, Dr. Murphy referred over $3,000,000 (paid for by Medicare and BCBSAL) of nerve tests to Valley Center for Nerve Studies and Rehabilitation, Inc. ("Valley Center"), a Huntsville, Alabama company.

44. Valley Center engaged QBR, LLC, a diagnostic-services company, to provide the equipment and technicians to perform nerve tests at physicians' offices. Under their agreement, Valley Center paid QBR 75% of net gross profits from the

reimbursement received by Valley Center for nerve testing conducted by QBR. QBR would also market Valley Center/QBR's services to physicians to get them to enter into agreements whereby they would refer their nerve tests to Valley Center/QBR. After the nerve testing was conducted by QBR, Valley Center used a Valley Center physician's NPI to bill for nerve tests, and someone at Valley Center would interpret the results.

45. Dr. Murphy entered into an agreement with QBR, pursuant to which Dr. Murphy was to be paid a set amount ($120) for each nerve test performed on his patients. The fee was nominally related to time Dr. Murphy and those in his office spent providing supervision related to the testing performed by QBR.

46. Evidence indicates that many of the nerve tests Dr. Murphy referred to Valley Center were: **(a)** referred in exchange for payments from QBR to Dr. Murphy (through NAPS and CMEO), and **(b)** medically unnecessary.

47. Evidence indicates that Dr. Murphy referred nerve tests to Valley Center that were paid for by Medicare, and that Dr. Murphy received payments from QBR for referring those nerve tests. These payments were made through NAPS and totaled close to a million dollars between approximately March 2013 and December 2017.

48. Evidence indicates that Dr. Murphy did not supervise the nerve testing, but that QBR disguised the payments as reimbursement for time Dr. Murphy and his

office staff spent supervising the nerve testing, when in fact the payments were calculated based on a rate of $120/per test for each test Dr. Murphy referred. Thus, to calculate Dr. Murphy's payment, QBR would: **(a)** identify the total number of nerve tests referred to Valley Center by Dr. Murphy; **(b)** multiply that number by $120; and **(c)** pay the identified amount to Dr. Murphy.

49.     In or about the beginning of 2014, however, QBR could no longer make the monthly payments to Dr. Murphy of $120 per test because Dr. Murphy was referring too many nerve tests. Accordingly, QBR switched to generally paying Dr. Murphy a set monthly rate. This set rate started at approximately $7,000.00 per month for January and February of 2014, but by March 2014, had increased to approximately $14,000.00 a month. In the beginning of 2015, the payment increased again to approximately $28,000.00 a month.

50.     In 2012, QBR developed a "timesheet" to provide purported paper support for the time that doctors and staff supposedly spent supervising testing. The timesheet used only the total number of nerve tests performed to create a pretextual calculation for how much time would be spent by individuals at the physician's office, including the physician, doing various tasks related to supervising the nerve testing. The physician tasks consisted of "medical necessity identification," "direct supervision," and "evaluation and interpretation." These timesheets were false, in part, because they did not reflect actual supervision time and were generated solely

based on the total number of tests performed. These timesheets continued to be generated even after QBR switched to paying Dr. Murphy a set monthly rate in 2014.

51. For instance, the January 2015 timesheet for Dr. Murphy's office stated that Dr. Murphy and his staff spent 769 hours in January supervising nerve testing, which equals 96 eight-hour workdays. According to the same timesheet, Dr. Murphy personally spent 214 hours, or *26.75 eight-hour workdays*, providing "medical necessity identification," "direct supervision," or "evaluation and interpretation" related to the nerve testing.

52. Evidence further indicates that Dr. Murphy and J. Murphy solicited (and received) "donations" from QBR to CMEO in order to keep Dr. Murphy's business.

53. Evidence further indicates that nerve tests referred by Dr. Murphy were medically unnecessary and were ordered for patients regardless of need, and that Dr. Murphy ordered the highest reimbursing number of studies using the highest reimbursing CPT code, 95913, which is used when 13 or more total nerve studies are performed as part of nerve testing and generally reimburses at the highest rate. Other CPT codes, 95905 through 95912, are to be used when fewer studies are done as part of the testing.

### ii. Urine Drug Tests

54.     Part of the practice of pain management involves the testing of patients' urine to monitor whether patients are taking prescribed drugs or taking or abusing drugs not prescribed, including illicit controlled substances.  Urine drug testing can involve a two-step process: **(a)** an initial screen, which yields rapid but sometimes less reliable results; and **(b)** a confirmation, which involves more complex processes, is more reliable, and is often referred to outside labs.  Insurance plans typically reimburse screens at a much lower rate than confirmations.

55.     From approximately January 2012 to September 2017 (five years), Dr. Murphy was responsible for millions of dollars of the urine drug tests paid for by Medicare and BCBSAL.  Some of that amount was for testing conducted by Dr. Murphy's clinic (much of it paid for by Medicare).  Most of the payments were for testing Dr. Murphy referred to two outside entities (much of it paid for by Medicare), that placed Contract Urine Collection Technicians at the NAPS locations to assist with urine collection.  W. Murphy and M. Murphy, Jr. were among the Contract Urine Collection Technicians placed at NAPs.

56.     Evidence indicates that many of these tests were: **(a)** referred in exchange for direct or indirect payments from these testing companies to Dr. Murphy, CMEO, W. Murphy, and M. Murphy Jr., and individuals who worked at NAPS, and **(b)** medically unnecessary.

57.     Evidence indicates that Dr. Murphy, CMEO, W. Murphy, and M. Murphy, Jr., received payments from urine drug testing labs, and from associated sales representatives and entities.   Some of the payments took the form of "donations" to CMEO.  Others took the form of the salaries paid by the urine drug testing companies to Contract Urine Collection Technicians ostensibly for those individuals' work as collection technicians, when in fact a significant portion of some of those individuals' duties comprised of providing administrative and other services to Dr. Murphy, J. Murphy, and NAPS.

58.     Evidence indicates that many of the urine drug tests were medically unnecessary.  For instance, a September 2015 BCBSAL letter summarizing the results of an audit noted that Dr. Murphy billed for a highly complex UDS testing method, and that "[d]ocumentation did not support the medical necessity for the monthly use of high complexity qualitative urine drug tests and/or referred confirmatory drug tests."

59.     Further, notwithstanding this high level of testing, purportedly to guard against patient misuse and diversion, evidence indicates that Dr. Murphy routinely ignored aberrant test results.  For instance, the ALBME investigation found that Dr. Murphy issued additional prescriptions for controlled substances to patients who tested positive for illegal substances or negative for prescribed controlled substances.

### iii. *Compounded Drugs and Other High-Reimbursing Drugs & DMEs*

60.     Most patients' needs are met by mass-produced, commercially available manufactured drugs that come in a range of standard doses. However, some patients have specialized needs that render mass-produced options inappropriate. For instance, patients who cannot swallow pills and patients who have allergies to common ingredients found in mass-produced drugs, may require individualized and customized compounded medications. Compounding pharmacies often also dispense non-compounded, but high-reimbursing drugs.

61.     From approximately 2012 to 2017, BCBSAL and Medicare paid pharmacies known to dispense compounded and some non-compounded prescriptions drugs, for millions of dollars worth of prescriptions issued by Dr. Murphy. The pharmacies that received the majority of the payments included Global Medical Equipment & Supplies, which was later purchased by Northside Pharmacy LLC, dba Global Compounding in Haleyville, Alabama; The Prescription Shop ("TPS") in Haleyville, Alabama; Alliance Allergy Solutions in Birmingham, Alabama; F&F Pharmacy in Demopolis, Alabama; and Strickland Drugs in Carbon Hill, Alabama.

62.     A physician can prescribe durable medical equipment ("DME") (which include back, neck, knee, and wrist braces) for a patient if the physician believes the DME is medically necessary because of the patient's medical condition and need.

63.     Evidence indicates that from approximately January 2012 to July 2017, BCBSAL and Medicare paid a durable medical equipment provider over $650,000 for prescriptions for back braces, knee braces, and other DME prescriptions written by Dr. Murphy.

64.     Evidence indicates that many of these prescriptions for compound and other drugs and DMEs were: **(a)** referred in exchange for payments from the above-described pharmacies and/or owners, or independent sales representatives associated with the above-described pharmacies and DME entities, and **(b)** medically unnecessary.

65.     For instance:

   a. From at least 2013 through 2016, CMEO received multiple payments from compounding pharmacies and sales representatives (and related entities) that provide "marketing services" to compounding pharmacies and DME entities. Individual payments were as high as $10,000.

   b. From 2012 to 2016, W. Murphy and M. Murphy, Jr. received multiple payments from entities associated with compounding pharmacies and DME entities. Some payments included the notation "brace/cream."

   c. The Contract Urine Collection Technicians also received payments from entities that marketed compounded drugs and DMEs. Generally, the process was: **(a)** urine collection technicians at Dr. Murphy's clinics issue prescriptions; **(b)** pharmacy/DME company bills and is paid by insurance companies for prescription; **(c)** pharmacy/DME company pays sales representative a cut of profit for payments made by insurance companies; and **(d)** sales representative pays urine collection technician a cut of the funds

paid by insurance companies for each of the prescriptions they referred.

66. Evidence indicates that prescriptions Dr. Murphy issued to be filled by these pharmacies were medically unnecessary because Dr. Murphy (directly and indirectly) received payments for them, and also because:

    a. In a September 2015 letter to Dr. Murphy summarizing the results of an audit, BCBSAL noted that in 12 months, Dr. Murphy wrote 1,490 prescriptions for compounded drugs, for which BCBSAL paid over $686,000.00. As part of the audit, a BCBSAL interviewed Dr. Murphy in October 2014. The BCBSAL representative asked Dr. Murphy about his high rate of prescribing compounded pain cream, and Dr. Murphy responded that he "believed patients received a placebo effect by being able to put the pain cream directly on the affected area, although you stated there were no studies to support your beliefs."

    b. Evidence indicates that Dr. Murphy delegated the decision to prescribe braces and compounded and other drugs to the urine collection technicians, who were not licensed to prescribe drugs, and who received "incentive pay" – a cut of the profit of each of these items they prescribed.

### iv. Office Visits

67. Evidence indicates that Dr. Murphy fraudulently billed for office visits and related services.

68. Dr. Murphy was on vacation and away from NAPS during at least the following time periods:

    a. 10/18/2012 – 10/31/2012
    b. 07/27/2014 – 08/03/2014
    c. 11/15/2014 – 11/22/2014
    d. 06/07/2015 – 06/14/2015

    e.  06/09/2016 – 06/17/2016
    f.  10/16/2016 – 10/23/2016
    g.  07/10/2017 – 07/14/2017

69.    Dr. Murphy billed insurers Medicare and BCBSAL for over 1,000 office visits that occurred during the above time-periods using his own NPI number and principally consisted of follow-up office visits (CPT code 99213).

70.    Under the applicable Medicare and BCBSAL billing requirements, these types of services can only be billed under Dr. Murphy's NPI number when they were performed or ordered by him directly, or when they were performed or ordered by staff over whom Dr. Murphy had supervision in the same office at the time of the services.

## IV.   MONEY LAUNDERING

71.    Evidence indicates that from at least 2012 to in or about March 2018, Dr. Murphy and J. Murphy engaged in financial and monetary transactions with proceeds of specified unlawful activities, in violation of Title 18, United States Code, Sections 1956 and 1957.

### A.  Relevant Statutes

72.    Title 18, United States Code, Section 1956(a)(1) makes it a crime to knowingly conduct, or attempt to conduct, a financial transaction with proceeds of specified unlawful activity with the specific intent to conceal or disguise the source, origin, nature, ownership, or control of the proceeds, evade reporting requirements,

or evade taxes. Specified unlawful activity is defined in Title 18, United States Code, Section 1956(c)(7), which incorporates Title 18, United States Code, Section 1961(1). Section 1961(1) includes controlled substances offenses in the definition of specified unlawful activity. Pursuant to Title 18, United States Code, Section 1956(c)(7)(F), the term "specified unlawful activity" also includes "any act or activity constituting an offense involving a Federal health care offense." Per Title 18, United States Code, Section 24, "Federal health care offense[s]" include violations of Title 18, United States Code, Sections 1347 and 1349 and of Title 42, United States Code, Section 1320a-7b.

73. Title 18, United States Code, Section 1957 makes it unlawful to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000.00 that is derived from specified unlawful activity. A monetary transaction refers to the deposit, withdrawal, transfer or exchange, in or affecting interstate commerce by, through, or to a financial institution.

74. Under Title 18, United States Code, Section 1956(h), any person who conspires to commit any offense defined in Title 18, United States Code, Section 1956 or 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

### B. Money Laundering Offenses

75.    Evidence indicates that Dr. Murphy derived proceeds of specified unlawful activities.  These specified unlawful activities included: **(a)** prescribing without a legitimate medical purpose; **(b)** health care fraud; and **(c)** soliciting and receiving kickbacks or bribes, including the QBR kickbacks.

76.    There is also cause to believe that Dr. Murphy, J. Murphy, and others engaged in financial transactions that sought to conceal the source, nature, or ownership of these proceeds of specified unlawful activities, in violation of Title 18, United States Code, Section 1956(a)(1) and (h).  These money laundering schemes are discussed below.

77.    Dr. Murphy, J. Murphy, and others conducted numerous financial transactions with the proceeds of these specified unlawful activities.  Those transactions were often conducted in a convoluted manner with proceeds being transferred to several different accounts, owned by various individuals and corporate entities, before ultimately being transferred to the Defendant Accounts, as well as other accounts.  Examples of these complex transactions – discussed in more detail in the section below addressing forfeiture – were likely undertaken so as to conceal the unlawful source of those proceeds.

78.    Dr. Murphy and others also used CMEO to launder proceeds of specified unlawful activities in the following ways:

a. Dr. Murphy and J. Murphy caused kickback payments (for nerve testing, urine drug testing, and compounded and other drugs filled by pharmacies) that were in fact intended for Dr. Murphy and J. Murphy to be made to CMEO, thereby disguising the nature of those transactions as well as the true owners of those funds.

b. Dr. Murphy and J. Murphy caused some of the cash received from patients as part of his prescribing of controlled substances without a legitimate medical purpose to be deposited into CMEO's, instead of NAPS's, bank accounts, thereby concealing the unlawful nature and/or source of those funds. Additionally, evidence indicates that at J. Murphy's instruction, individuals working at NAPS (including urine collection technicians) frequently purchased cashier's checks from several different financial institutions with currency. Cashier's checks were typically purchased in the employees' names and made payable to CMEO. The complex transactions of converting this currency to cashier's checks and depositing those cashier's checks into the CMEO account, served to conceal both the unlawful source of those criminal proceeds as well as the true owners of those funds, Dr. Murphy and J. Murphy.

c. Dr. Murphy and others used CMEO for personal expenses, instead of for its purported charitable purpose of helping children and adults visit national parks and historical sites (it ostensibly also provides college scholarships and aid to struggling income families). Evidence indicates that Dr. Murphy and J. Murphy used CMEO's funds to fund vacations for themselves, their children (including M. Murphy, Jr. and his family), members of the NAPS office staff and their family members, and some church members. These included vacations to Sea World in 2009, Italy in 2009, the Holy Land Cruise in 2012, an Alaskan cruise in 2014, and several other vacations. The use of these funds for personal expenses indicates that Dr. Murphy and J. Murphy were the true owners of the funds, but sought to conceal that fact by causing the kickback payments to be made to CMEO.

79.    Additionally, Dr. Murphy and others, using the proceeds of specified unlawful activities, knowingly conducted monetary transactions with criminally

derived property greater than $10,000.00.  Specific examples are provided in the next section.

## V.   DEFENDANT ACCOUNTS

### A. Relevant Forfeiture Statutes and Principles

80.    Title 18, United States Code, Section 981(a)(1)(A) subjects to civil forfeiture any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 or 1957, or any property traceable to such property.

81.    Title 18, United States Code, Section 981(a)(1)(C) subjects to civil forfeiture any property real or personal, which constitutes or is derived from specified unlawful activity, as defined in Title 18, United States Code, Section 1956(c)(7).  As described above, specified unlawful activity includes violations of Title 18, United States Code, Sections 1347 and 1349 and of Title 42, United States Code, Section 1320a-7b.

### B. Relevant Checking and Investment Accounts

82.    Based on financial records obtained related to Dr. Murphy, NAPS, and related individuals and entities, Dr. Murphy owned and/or controlled several checking accounts, including, but not limited to the following:

Regions Bank account *9138 (hereafter "**REGIONS-NAPS**"), was opened at least as of January 2013 and closed in July 2016.  This account was in the following names - NORTH ALABAMA PAIN

SERVICE," "Dr. MARK MURPHY, M.D.," and "Dr. MARK MURPHY." DR. MURPHY had signature authority.

83. Dr. Murphy and/or J. Murphy owned and/or controlled several investments accounts, including, but not limited to, the following:

a. Raymond James Financial account number *7167 (hereafter "**RJ-MM #1**"). This account was initially opened on June 4, 2007 as Morgan Keegan account *6808, and in January 2013 rolled into the Raymond James account *7167, in the name of "MARK MURPHY M.D. DEFINED BENEFIT & TRUST" for both accounts. On July 9, 2015, it became a variable annuity investment account with Dr. Murphy as the listed annuitant and owner.

b. Raymond James account *2077 (hereafter "**RJ-MM #2**"), was opened on November 18, 2013. It was assigned to account owner MARK MURPHY M.D. DEFINED BENEFIT & TRUST. "MARK MURPHY" signed the account documents as the owner.

c. Raymond James account *5335 (hereafter "**RJ-MM #3**"), was opened on July 13, 2015. It was opened and assigned to account owner "MARK MURPHY," who signed the account documents as the owner.

d. BB&T Securities, LLC account *8265 (hereafter "**BB&T-MM #1**") was opened on May 31, 2016. It was assigned to account owner "MARK MURPHY M.D. SELF EMPLOYED PENSION PLAN." The client data form describes the account as a trustee directed 401(k) plan. The account is registered to "MARK MURPHY M.D. DEFINED BENEFIT PL & TR." "MARK MURPHY" signed the account documents as the owner.

e. BB&T Securities, LLC account *1623 (hereafter "**BB&T-MM #2**"), was opened on May 31, 2016. It was assigned to account owner "MARK MURPHY M.D. SELF EMPLOYED PENSION PLAN." The client data form describes the account as a trustee directed 401(k) plan. The account is registered to "MARK MURPHY M.D. DEFINED BENEFIT PL & TR."

f. BB&T Securities, LLC account *5508 (hereafter "**BB&T-MM #4**"), was opened on November 28, 2017. It was assigned and registered to "MARK MURPHY," and Jennifer Murphy is the designated beneficiary. The Account & Disclosure Contract identifies the accounts as a traditional Individual Retirement Account (IRA).

g. BB&T Securities, LLC account *2106 (hereafter "**BB&T-JM**"), was opened on November 28, 2017. It was assigned and registered to "JENNIFER MURPHY," and Mark Murphy is the designated beneficiary. The Account & Disclosure Contract identifies the accounts as an IRA.

84.     As discussed in more detail below, this complaint alleges that **BB&T-MM #4** and **BB&T-JM** (collectively the "Defendant Accounts") represent property involved in money laundering and/or proceeds of health care fraud and violations of the Anti-Kickback Statute.

## C. The Defendant Accounts are Subject to Civil Forfeiture

85.     The Defendant Accounts are forfeitable as: **(a)** property involved in money laundering, the proceeds of health care fraud (fraudulently billing for office visits), and QBR kickbacks; or **(b)** property traceable thereto, pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 981(a)(1)(C).

86.     From January 2013 until June 2016, **REGIONS-NAPS** served as a business account for NAPS. This account was materially funded by payments from QBR. QBR typically made payments in the form of checks. As discussed above, evidence indicates that those QBR payments represent the proceeds of specified

unlawful activities, specifically the solicitation and receipt of kickbacks from QBR for nerve tests.

    **i.**    *Funds Held in REGIONS-NAPS Contained Property Involved in Title 18, United States Code, Section 1956(a)(1)(B)(i)*

87.    Dr. Murphy conducted or caused financial transactions, including wires and deposits, to occur into **REGIONS-NAPS** in order to conceal the nature of the proceeds of the QBR kickbacks, and thus these funds represented property involved in money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i). Dr. Murphy concealed the nature of the proceeds of the QBR kickbacks by: **(a)** using memo notations to disguise the nature of the QBR payments; and **(b)** commingling or causing to be commingled proceeds of the QBR kickbacks with funds that appeared to be ordinary business and/or legitimate income.

88.    Between March 3, 2013 and April 18, 2016, QBR paid Dr. Murphy $798,390.00, which was deposited into **REGIONS-NAPS**:

    a.  In 2013, a total of approximately $167,310.00 in checks from QBR was deposited into **REGIONS-NAPS**. The checks were issued on a periodic (roughly monthly) basis and were in varying amounts with the highest, for "June Testing Services" in the amount of $25,200.00. The checks had notes on the memo line including "Service Payment (Oct/Nov)," "Jan testing – 114 NCVs," and "April Service Fees."

    b.  In 2014, a total of approximately $194,080.00 in checks from QBR was deposited into **REGIONS-NAPS**. The checks were issued on a periodic (roughly bi-weekly) basis and were typically in the amounts of $7,000.00 or $14,000.00. The checks had notes on the memo line, including "partial Monthly Pmt.," "Physician Svcs. Pmt

on Balance," "2 week payment schedule," "Phys Svcs, June 2014 (partial)," and "Physician Fees."

    c.  In 2015, a total of approximately $325,000.00 in checks from QBR was deposited into **REGIONS-NAPS**. The checks were issued on a periodic (roughly bi-weekly) basis, often in amounts of $14,000.00, and had notes on the memo line, including "Services" and "Payment."

    d.  For the first part of 2016 (ending April 18, 2016),[2] a total of approximately $112,000.00 in checks from QBR was deposited into **REGIONS-NAPS**, in amounts of $14,000.00. The checks had notes on the memo line, including "Physician Services" and "Physician Fees."

89.    A memo line on a check is commonly used to describe the purpose of payment from the payer to the payee. Several of the memo lines on the QBR checks shown above were notated with the following text: "Service Fees," "Physician Fee," "Physician Fees," "Physician Services," "Services," "Payment for Services," "Testing Services," etc. The purpose for payment described on the memo line disguised the actual nature of proceeds received from QBR. The attempt to detail the purpose of the payments from QBR as legitimate services rendered during the course normal business practices was part of the attempt by Dr. Murphy and others to conceal the true nature of proceeds received from QBR.

90.    Because medical professionals bill and are paid for services they render, insurance claims paid by insurers to medical professionals often appear to be payments for normal and seemingly legitimate business operations. These claims

---

[2] After this time, QBR checks were deposited into a different NAPS account.

are usually deposited into a business bank account along with other ordinary business income.  Dr. Murphy further sought to conceal the true nature of the proceeds received from QBR by commingling the kickback payments with funds that appeared to derive from ordinary business income deposited in **REGIONS-NAPS**.  By depositing and commingling these proceeds into **REGIONS-NAPS**, Dr. Murphy attempted to make QBR's payments appear as ordinary business income earned through the normal course of business.

### *ii.  Property Managed by BB&T Securities, LLC and maintained in BB&T-MM #4 in the Name of Mark Murphy with Designated Beneficiary, Jennifer Murphy is Subject to Forfeiture*

91.  The approximately $1,058,153.78 worth of equities, annuities, and other investment vehicles contained in **BB&T-MM #4** is subject to civil forfeiture as: **(a)** property involved in money laundering, **(b)** property traceable to such property, and/or **(c)** property traceable to the proceeds of health care fraud and violations of the Anti-Kickback Statute.

92.  On November 28, 2017, Dr. Murphy opened **BB&T-MM #4**.  The account was funded with equities, annuities, and other investment assets from **BB&T-MM #2**.  On or about May 31, 2016, Dr. Murphy opened **BB&T-MM #2**.  The account was funded with equities, mutual funds, and other investment assets previously purchased by Dr. Murphy and managed and maintained by Raymond James Financial via **RJ-MM #2**.  As discussed below, **RJ-MM #2** was funded

through transfers from **RJ-MM #1**, which received transfers from **REGIONS-NAPS**.

93.     All equities, annuities, and other investment assets contained in **BB&T-MM #4** are subject to seizure and forfeiture as property involved in money laundering because as described further below, Dr. Murphy and/or J. Murphy transferred or caused to be transferred the proceeds of QBR kickbacks to **BB&T-MM #4** with the intent to conceal or disguise the nature, source, location, ownership, or control of those proceeds. Thus, to the extent that any funds seized from **BB&T-MM#4** are derived from legitimately earned income, they are still subject to forfeiture because they served to conceal the unlawful source, nature, and ownership of the proceeds of health care fraud and QBR kickbacks.

94.     As previously set out, Dr. Murphy and others sought to conceal the nature of the funds in the **REGIONS-NAPS** account by using misleading memo notations and by commingling the funds with seemingly ordinary business income. Therefore, because as discussed below, the funds in **BB&T-MM #4** came from **REGIONS-NAPS**, they are subject to forfeiture as property *traceable* to property involved in money laundering.

95.     In addition, the contents of **BB&T-MM #4** are subject to forfeiture as property *involved* in money laundering because Dr. Murphy further sought to conceal the source and/or nature of these proceeds by engaging in a series of

complex financial transactions – from **REGIONS-NAPS** to **RJ-MM #1**, then to **RJ-MM #2**, to **BB&T-MM #2**, and finally to **BB&T-MM #4**.

96. Below is a summary of the financial transactions conducted that led to the opening of **BB&T-MM #4**:

97. *Transfers from **REGIONS-NAPS** into **RJ-MM #1***. From on or about April 3, 2013, to September 18, 2014, Dr. Murphy transferred or caused to be transferred approximately $234,000.00 of criminally derived proceeds from **REGIONS-NAPS** into **RJ-MM #1**. As described above, **REGIONS-NAPS** contained the proceeds of QBR kickbacks.

98. *Transfer from **REGIONS NAPS** into **RJ-MM #2***. On December 5, 2013, Dr. Murphy electronically transferred or caused to be transferred approximately $155,999.52 from **REGIONS-NAPS** into **RJ-MM #2**.

99. *Transfers from **RJ-MM#1** into **RJ-MM #2***. Dr. Murphy made or caused to be made the following transfers from **RJ-MM #1** (which, as discussed, received funds from **REGIONS-NAPS**) to **RJ-MM #2**. On or around March 6, 2014, roughly $45,825.00 of equities and other assets was transferred from **RJ-MM #1** to **RJ-MM #2**. On or around October 17, 2014, approximately $14,000.00 of equities and other assets was transferred from **RJ-MM #1** to **RJ-MM #2**. On or around March 11, 2015, approximately $283,678.60 of equities and other assets was transferred from **RJ-MM #1** to **RJ-MM #2**.

100. *Transfer from **RJ-MM #2** to **BB&T-MM #2***. The proceeds electronically transferred from **REGIONS-NAPS** and **RJ-MM #1** into **RJ-MM #2** were used to purchase equities, mutual funds, and other investment assets maintained in a portfolio managed by Raymond James Financial. On or around July 7, 2016, Dr. Murphy transferred or caused to be transferred the valuation of roughly $523,658.28 worth of equities and other investment assets from **RJ-MM #2** into **BB&T-MM #2**.

101. *Transfer from **BB&T-MM #2** to **BB&T-MM #4***. On or about December 7, 2017, some of the contents of **BB&T-MM #2**,[3] approximately $500,000.00 worth of equities, annuities, and other investment vehicles, were transferred to **BB&T-MM #4**. Therefore, the contents of **BB&T-MM #4** are subject to forfeiture because they represent property involved in money laundering.

102. Additionally, many of these transactions exceeded $10,000.00, and thus are also partially subject to forfeiture as property involved in violations of, Title 18, United States Code, Section 1957.

---

[3] The balance of **BB&T-MM #2** as of December 31, 2017 was $4.16. Almost the entire remaining balance of **BB&T-MM #2** was transferred to **BB&T-MM #4** and **BB&T-JM** on December 7, 2017.

### iii. Property Managed by BB&T Securities, LLC and maintained in BB&T-JM in the Name of Jennifer Murphy with Designated Beneficiary, Mark Murphy is Subject to Forfeiture

103.  The approximately $380,723.35 of equities, annuities, and other investment vehicles contained in **BB&T-JM** is subject to forfeiture as: **(a)** property involved in money laundering, **(b)** property traceable to such property, and/or **(c)** property traceable to proceeds of health care fraud and violations of the Anti-Kickback Statute.

104.  On November 28, 2017, J. Murphy opened **BB&T-JM**.  The account was funded with equities, annuities, and other investment assets from **BB&T-MM #1** and **BB&T MM#2**.

105.  On May 31, 2016, Dr. Murphy opened **BB&T-MM #1**.  The account was funded with equities, annuities, and other investment assets previously purchased by Dr. Murphy and managed and maintained by Raymond James Financial via **RJ-MM #1**.  As discussed below, **RJ-MM #1** was funded through transfers from **RJ-MM #3**, which received transfers from **REGIONS-NAPS**.

106.  As discussed above, **BB&T-MM #2** was funded with equities, mutual funds, and other investment assets previously purchased by Dr. Murphy and managed and maintained by Raymond James Financial via **RJ-MM #2**.  **RJ-MM #2** was funded through transfers from **RJ-MM #1**, which received transfers from **REGIONS-NAPS**.

107.    As previously set out, Dr. Murphy, J. Murphy, and others sought to conceal the nature of the funds in the **REGIONS-NAPS** account by using misleading memo notations and by commingling the funds with seemingly ordinary business income.  Therefore, because as discussed below, the funds in **BB&T-JM** came from **REGIONS-NAPS**, those funds are subject to seizure as property *traceable* to property involved in money laundering.

108.    In addition, the contents of **BB&T-JM** are subject to forfeiture as property *involved* in money laundering because Dr. Murphy and/or J. Murphy further sought to conceal the source and/or nature of these proceeds by engaging in a series of complex financial transactions – **REGIONS-NAPS** to **RJ-MM #1** and to **RJ-MM #3**, from **RJ-MM #3** to **RJ-MM #1**, to **BB&T-MM #1**, and from **REGIONS-NAPS** to **RJ-MM #1**, then to **RJ-MM #2**, to **BB&T-MM #2**, and finally to **BB&T-JM**.

109.    As mentioned above, from on or about April 3, 2013, to September 18, 2014, Dr. Murphy transferred or caused to be transferred approximately $234,000.00 of criminally derived proceeds from **REGIONS-NAPS** into **RJ-MM #1**, which contained the proceeds of QBR kickbacks.

110.    *Transfers from **REGIONS-NAPS** to **RJ-MM #3***.  Dr. Murphy then also made the following or caused to be made the following transfers from **REGIONS-NAPS** to **RJ-MM #3**.  On or about July 16, 2015, approximately $50,000.00 was

transferred from **REGIONS-NAPS** into **RJ-MM #3**. On or around October 15, 2015, approximately $125,000.00 was transferred from **REGIONS-NAPS** into **RJ-MM #3**.

111. *Transfers from RJ-MM #3 to RJ-MM #1*. Then, on or about October 15, 2015, Dr. Murphy transferred or caused to be transferred approximately $200,000 from **RJ-MM #3** to **RJ-MM #1**.

112. *Transfers from RJ-MM #1 to BB&T-MM #1*. The QBR kickback proceeds wire transferred from **REGIONS-NAPS** and **RJ-MM #3** into **RJ-MM #1** were used to purchase equities and other investment assets maintained in a portfolio managed by Raymond James Financial. In or about July 2016, Dr. Murphy transferred or caused to be transferred the valuation of approximately $536,943.90 worth of securities and annuities, and other assets from **RJ-MM #1** into **BB&T-MM #1**.

113. *Transfers from RJ-MM#1 into RJ-MM #2*. As discussed above, Dr. Murphy made or caused to be made the following transfers from **RJ-MM #1** (which, as discussed, received funds from **REGIONS-NAPS**) to **RJ-MM #2**. On or around March 6, 2014, roughly $45,825.00 of equities and other assets was transferred from **RJ-MM #1** to **RJ-MM #2**. On or around October 17, 2014, approximately $14,000.00 of equities and other assets was transferred from **RJ-MM #1** to **RJ-MM**

**#2**.  On or around March 11, 2015, approximately $283,678.60 of equities and other assets was transferred from **RJ-MM #1** to **RJ-MM #2**.

114.  *Transfer from* ***RJ-MM #2 to BB&T-MM #2***.  The proceeds electronically transferred from **REGIONS-NAPS** and **RJ-MM #1** into **RJ-MM #2** were used to purchase equities, mutual funds, and other investment assets maintained in a portfolio managed by Raymond James Financial.  In or around July 2016, Dr. Murphy transferred or caused to be transferred the valuation of roughly $523,658.28 worth of equities and other investment assets from **RJ-MM #2** into **BB&T-MM #2**.

115.  *Transfers from* ***BB&T-MM #1*** *and* ***BB&T-MM #2 to BB&T-JM***.  On or about December 7, 2017, the contents of **BB&T-MM #1**,[4] approximately $290,872.84, were transferred to **BB&T-JM**, and some of the contents of **BB&T-MM #2**, approximately $100,856.83, were transferred to **BB&T-JM**.  Therefore, the assets contained in **BB&T-JM** are subject to forfeiture because they represent property involved in money laundering.[5]

116.  Additionally, many of these transactions exceeded $10,000.00, and thus are also partially subject to forfeiture as property involved in violations of Title 18, United States Code, Section 1957.

---

[4] The balance of **BB&T-MM #1** as of December 31, 2017, was $73.36.

[5] **Attachment-2** is a visual depiction of the transfers leading up to the December 7, 2017 transfer of funds into **BB&T-MM#4**.

## CONCLUSION

117. The approximately $1,058,153.78 worth of equities, annuities, and other investment vehicles contained in BB&T Account Number ****-5508 held in the name of Mark Murphy with Designated Beneficiary, Jennifer Murphy is subject to civil forfeiture as:

      a.     Proceeds of healthcare fraud and violations of the Anti-Kickback Statute, in violation of Title 18, United States Code, Section 981(a)(1)(C);

      b.     Property Involved in Money Laundering, in violation of Title 18, United States Code, Section 981(a)(1)(A).

118. The approximately $380,723.35 worth of equities, annuities, and other investment vehicles contained in BB&T Account Number ****-2106 held in the name of Jennifer Murphy with Designated Beneficiary, Mark Murphy is subject to civil forfeiture as:

      a.     Proceeds of healthcare fraud and violations of the Anti-Kickback Statute, in violation of Title 18, United States Code, Section 981(a)(1)(C);

      b.     Property Involved in Money Laundering, in violation of Title 18, United States Code, Section 981(a)(1)(A).

119. The names and addresses of possible claimants known to the United States are as follows:

| | |
|---|---|
| Dr. Mark Murphy | Jennifer Murphy |
| 2950 Mooresville Highway | 2950 Mooresville Highway |
| Lewisburg, Tennessee 37091 | Lewisburg, Tennessee 37091 |
| | |
| Ed Yarbough | Hal Hardin |
| c/o Dr. Mark Murphy | c/o Jennifer Murphy |
| Bone McAllester Norton PLLC | Hardin Law Office |
| Nashville City Center | 211 Union St., Suite 200 |
| 511 Union Street, Suite 1600 | Nashville, TN 37201 |
| Nashville, Tennessee 37219 | |

WHEREFORE, the Plaintiff requests that due notice issue to enforce the forfeiture and to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed; that the named Defendant Accounts be condemned and forfeited to the United States of America for disposition according to law; and for such other and further relief as this Court may deem just and proper.

JAY E. TOWN
United States Attorney

*/s/ Nicole Grosnoff*
Nicole Grosnoff
Assistant United States Attorney
United States Attorney's Office
Northern District of Alabama
1801 Fourth Avenue, North
Birmingham, AL 35203
Phone: (205) 244-2132
Fax:   (204) 244-2184
Email: nicole.s.grosnoff@usdoj.gov

## **VERIFICATION**

I, Kristina R. Waluyn, am a Special Agent for the Internal Revenue Service, and the agent assigned responsibility for this case.

I have read the contents of the foregoing Complaint for Forfeiture *In Rem*, and the statements contained therein are true to the best of my knowledge and belief. I base my knowledge for this verification of the Complaint for Forfeiture *In Rem* on the following:

a.  Information provided to me by other law enforcement officers who have participated in the investigation of Dr. Mark Murphy and Jennifer Murphy;

b.  My participation in the investigation surrounding the seizure of the Defendant Assets in this action;

c.  My experience in narcotics trafficking, health care fraud, and related financial investigations concerning the proceeds of those crimes and the experience of other law enforcement officers related to such investigations.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 27th day of July 2018.

Kristina R. Waluyn
Special Agent
Internal Revenue Service